1997 ND 172

**LeRoy THOMPSON, Plaintiff
and Appellant,**

v.

**CITY OF WATFORD CITY, Defendant
and Appellee.**

Civil No. 960335.

Supreme Court of North Dakota.

Sept. 8, 1997.

Rehearing Denied Sept. 30, 1997.

David Boeck (argued), Protection and Advocacy Project, Bismarck, for plaintiff and appellant.

McGee, Hankla, Backes & Wheeler, Ltd., Minot, for defendant and appellee; argued by Jason R. Vendsel.

MESCHKE, Justice.

[¶ 1] LeRoy Thompson appealed a judgment dismissing his action against Watford City for discriminatory employment practices, including failure to reasonably accommodate his mental disability, and for wrongful termination of his employment. We affirm the trial court's conclusion the City had non-discriminatory reasons for discharging Thompson.

[¶ 2] Thompson worked as a garbage collector for the City for 19 years. He was a slow worker who normally did not collect his full share of the garbage. Co-workers often became frustrated with Thompson, and yelled at him and called him names to try to get him to work faster. They also complained to David Johnson, the Superintendent of Public Works. Periodically, Johnson met with Thompson to discuss these problems, and then usually Thompson's work improved for awhile.

[¶ 3] Thompson left work early without permission in December 1993, after an argu-

ment with Robert Wehrung, the garbage-truck driver. Thompson had been working slowly, and Wehrung kept moving the truck beyond Thompson's reach to get him to move faster. Johnson again met with Thompson, and Thompson admitted he intentionally worked slowly to make it last longer. Johnson warned Thompson that walking off the job was unacceptable and could get him fired. Johnson also asked Thompson to bring future complaints about co-workers directly to him. Thompson said he understood. Johnson placed a written reprimand in Thompson's personnel file and suspended him without pay for a couple of days.

[¶ 4] In late June 1994, Thompson was collecting garbage with Harry Braddock, a local high-school student. Braddock worked faster than Thompson and tried to help Thompson on his side of the street. He also climbed on Thompson's side of the truck, and Thompson, who disliked someone else riding on his side, started an argument. When Braddock turned his back, Thompson tried to hit him twice but missed both times. In his driver's mirror, Wehrung saw Thompson swinging at Braddock, got out, and told Thompson to go back to the shop to "cool off." Thompson refused, walked off the job again, and went fishing.

[¶ 5] The next day, Thompson came in and cleaned out his locker. Before he left, Johnson asked him about his conduct, and Thompson said he wished he would have hit Braddock. Johnson told Thompson to get back to work and also said the two of them would meet later with the mayor to discuss the situation. Thompson told Johnson he could stick the job "up his ass," and Thompson left again.

[¶ 6] Johnson became worried about employee safety because, even after 16 hours, Thompson still had not calmed down. He was also concerned about Thompson's repeated unexcused absences. Johnson felt Thompson was no longer listening to him, and Johnson could not control him. Based on these concerns and Thompson's poor work habits, Johnson recommended termination of his employment at the regular meeting of the City Council on July 5. The Council temporarily deferred action but, at a July 12 special meeting, the Council voted to discharge Thompson.

[¶ 7] Thompson sued the City for refusing to make reasonable accommodations for him, and for wrongfully discharging him for a mental disability. The City denied any discrimination against Thompson.

[¶ 8] At a trial without a jury, Janelle Olson, a developmental disabilities advocate for the State Protection and Advocacy Project, described Thompson's mental abilities. She testified that Thompson could not read or write and was unable to handle his own money. In her opinion, Thompson was functionally limited in learning, self-direction, and capacity for independent living. Although Thompson lived independently, shopped for his own groceries, and cooked his own meals, his sister managed his checking account for him and paid his bills, including his charge account at the grocery store.

[¶ 9] The trial court found Thompson mentally disabled: "[He] is mentally impaired to a degree which renders him substantially limited in the following areas of major life activity: 1. receptive and expressive language; and, 2. learning." However, the court was not convinced that the City fired him for his disability:

> [T]he Court is *not* persuaded that [the City] discharged [Thompson] *because of* [Thompson's] mental disability. Rather, [the City] discharged [Thompson] because of persistent and unremedied deficiencies in [Thompson's] job performance; because he twice left his job without permission (i.e., unexcused absences); and, on one occasion he attempted to strike a fellow employee. Further, while [Thompson] does have a mental disability, there is no indication that this particular disability in any manner hindered [Thompson] in the performance of his garbage collecting duties.

Rather, the court concluded Thompson made no effort to remedy his job deficiencies or to keep his job:

> [Thompson] was given an opportunity to work through proper channels in an attempt to resolve the problems he was experiencing at work, prior to having this matter submitted to the City Council.

However, [Thompson] declined to participate in a proposed meeting with Superintendent of Public Works Johnson and Mayor Bolken, telling Mr. Johnson that he could take [the] job and "shove it."

While the Court can understand that a person with [Thompson's] diminished mental capacity might react impulsively to verbal harassment by fellow employees by walking off the job, it is much more difficult to comprehend why [Thompson]——in no uncertain terms——turned down an opportunity to explain his situation and redeem himself outside the presence of his tormentors. [Thompson] showed little regard for his job when he declined to meet informally with Mr. Johnson and Mayor Bolken——two people with whom [Thompson] apparently had no quarrel and whom [Thompson] had to know would have significant input in any decision concerning [Thompson's] future employment status with [the City].

The court found the City had proven "legitimate, non-discriminatory reasons for terminating [Thompson's] employment" and dismissed his action. Represented by a new lawyer, Thompson appealed.

[¶ 10] Thompson argues the trial court erred in finding the City did not discriminate against him. He complains the trial court did not make any findings on the City's refusal to make reasonable accommodations for his mental disability. Thompson argues the City's refusal to make one or more accommodations created an impossible work environment for him, adversely affected his employment, and led to his discharge.

[¶ 11] The City responds the trial court correctly found that Thompson had been discharged for legitimate and non-discriminatory reasons. According to the City, the trial court ruled out any need for reasonable accommodations when it found Thompson's mental disability did not hinder his physical work performance. The City contends, since Thompson could perform the work without accommodations, he was not entitled to any.

■ [¶ 12] A trial court's decision on whether an employer discriminated against an employee is a finding of fact. *Schweigert v. Provident Life Ins. Co.*, 503 N.W.2d 225, 229 (N.D.1993). NDRCivP 52(a)(part) directs: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." A finding of fact is clearly erroneous if it is based on an erroneous view of the law, if the evidence does not support it, or if the reviewing court, based on the entire record, is convinced that a mistake has been made. *Schweigert* at 229. As we explained in *Buzick v. Buzick*, 542 N.W.2d 756, 758 (N.D.1996): "When reasonable evidence in the record supports the findings, we will not retry the case to substitute findings we might have made for those of the trial court."

[¶ 13] The unitary North Dakota Human Rights Act prohibits discrimination in employment for a number of reasons, including mental or physical disability. NDCC 14-02.4-01. Discriminatory practices include discharge of an employee solely for a physical or mental disability or "for an employer to fail or refuse to make reasonable accommodations for an otherwise qualified person with a physical or mental disability." NDCC 14-02.4-03. An "otherwise qualified person" means one "who is capable of performing the essential functions of the particular employment in question." NDCC 14-02.4-02(10). Disability "means a physical or mental impairment that substantially limits one or more major life activities, a record of this impairment, or being regarded as having this impairment." NDCC 14-02.4-02(3). But "it is not a discriminatory practice for an employer ... to discharge an individual from a position ... on the basis of ... physical or mental disability ... in those circumstances where ... physical or mental [ability] ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business...." NDCC 14-02.4-08. Having performed the essential physical functions of garbage collection in a reasonably satisfactory manner for 19 years, Thompson was certainly otherwise qualified for his work despite his mental disability.

■ [¶ 14] The Human Rights Act does not detail exactly what accommodations an

employer must make for the disability of an otherwise qualified worker. *See* NDCC 14–02.4–03 ("a discriminatory practice for an employer to fail or refuse to make reasonable accommodations for an otherwise qualified person with a ... mental disability ..."). Rather, the Act describes only in general terms what constitutes a failure or refusal. " 'Discriminatory practice' means an act or attempted act which because of ... mental disability ... results in the unequal treatment ... of any persons, or denies, prevents, limits, or otherwise adversely affects ... the benefit of enjoyment by any person of employment...." NDCC 14–02.4–02(4). These general definitions make the reasonableness of any particular and proposed accommodation a factual question for decision by the fact finder.

[¶ 15] In disparate treatment cases, a majority of this court has modified and adopted a version of the federal procedure to assist claimants relying on indirect evidence to prove a violation of the Human Rights Act. *Schweigert v. Provident Life Ins. Co.*, 503 N.W.2d 225, 229 (N.D.1993); *Schuhmacher v. North Dakota Hosp. Ass'n*, 528 N.W.2d 374, 377–78 (N.D.1995); *see also* Nicholas W. Chase, Comment, *Civil Rights—Employment Discrimination: Modifying Federal Standards To Reflect Principles of State Law: The North Dakota Supreme Court's Examination of the Hicks Rationale Prompts The Court to Customize Its Own Standard To Review State–Based Employment Discrimination Claims*, 70 N.D.L.Rev. 207 (1994). But Thompson did not claim disparate treatment based on indirect evidence.

[¶ 16] Rather, Thompson claimed that he was a qualified person with a disability and that the City did not reasonably accommodate his disability. Unlike the *Schweigert* and *Schuhmacher* claimants, Thompson's claim alleged facts that, if proven, would have directly established a violation of the Human Rights Act, without the need for using any version of the *McDonnell–Douglas–Burdine*, burden-shifting framework that we modified and adopted in *Schweigert*, 503 N.W.2d at 229. *See Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 1281, 1283 (7th Cir.

1996) and cases cited therein. Where employee's complaint against employer "relates solely to [the employer's] failure to reasonably accommodate his disability," application of the *"McDonnell–Douglas* burden-shifting method of proof is unnecessary and inappropriate...." *Bultemeyer*, 100 F.3d at 1283–4. This is not a disparate treatment claim, and Thompson's claim was decided with the usual burden of proof on the claimant.

[¶ 17] The Human Rights Act also imposes some limits on what is reasonable to accommodate. An employer need not make an accommodation that will

a. Unduly disrupt or interfere with the employer's normal operations;

b. Threaten the health or safety of the individual with a disability or others;

c. Contradict a business necessity of the employer; or

d. Impose undue hardship on the employer, based on the size of the employer's business, the type of business, the financial resources of the employer, and the estimated cost and extent of the accommodation.

NDCC 14–02.4–02(16). These definitions require a disabled employee to prove that the employee sought an accommodation that was reasonable under the circumstances and that the employer unreasonably refused or failed to make it. *See Milan v. Illinois Human Rights Comm'n*, 169 Ill.App.3d 979, 120 Ill. Dec. 244, 248, 523 N.E.2d 1155, 1159 (1988): "[T]he employee bears the burden to assert the duty and to show that the accommodation was requested and necessary for adequate job performance."

[¶ 18] On appeal, Thompson urges four accommodations the City should have made for Thompson in his work: 1) giving him more frequent pep talks; 2) instructing co-workers not to harass him; 3) assisting him to obtain a commercial driver's license; and 4) offering communication assistance to enable Thompson's participation in the proffered meeting with the superintendent and the mayor. While each of these proposals might have helped Thompson if he had been kept as an employee, there was no evidence in this record that Thompson, or anyone on

his behalf, sought these specific accommodations from the City before his discharge or even before this action was commenced.

[¶ 19] The evidence did show that Johnson's pep talks to Thompson had often helped improve his work in the last five years, that Johnson had sometimes asked his co-workers to refrain from teasing Thompson, and that Johnson had encouraged Thompson to get a commercial driver's license to become a more useful employee. But the evidence does not disclose that either Thompson, or anyone on his behalf, specifically suggested more accommodation to his supervisor after Thompson's fracas with a co-worker and absenting himself from work. There is no evidence that anyone asked to accompany Thompson to the meeting with the mayor and Johnson which Thompson vividly spurned. Without evidence of such requests, we cannot fault the trial court for not making specific findings on the now suggested accommodations.

[¶ 20] Normally, an employee's work performance must be satisfactory to prove employment discrimination. *Schuhmacher v. North Dakota Hosp. Ass'n*, 528 N.W.2d at 378. Chief Judge Posner, writing for the Seventh Circuit, recently expressed this concept well:

> [I]f an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act. The Act does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone. The Act protects only "qualified" employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one.
>
> It is true that an employer has a statutory duty to make a "reasonable accommodation" to an employee's disability, that is, an adjustment in working conditions to enable the employee to overcome his disability, if the employer can do this without "undue hardship." 42 U.S.C. sec. 12112(b)(5)(A). But we cannot believe that this duty runs in favor of employees who commit or threaten to commit violent acts. The retention of such an employee would cause justifiable anxiety to coworkers and supervisors. It would be unreasonable to demand of the employer either that it force its employees to put up with this or that it station guards to prevent the mentally disturbed employee from getting out of hand.

*Palmer v. Circuit Court of Cook County*, 117 F.3d 351, 352–53 (7th Cir.1997) (citations omitted)(affirming summary judgment dismissing claim of social service caseworker who was mentally ill with depression and paranoia and who was fired after a series of "personality conflicts" with co-worker and supervisor). Like Palmer, Thompson was discharged for unacceptable job behavior, not his mental disability.

[¶ 21] The evidence in this case proved Thompson had not been performing satisfactorily. He worked more slowly, walked off the job without permission, and tried to hit a co-worker. He went fishing when directed to return to the shop to "cool off," and he rejected a meeting with his supervisor and the mayor about keeping his job despite these job failings. The trial court found Thompson's job-related conduct gave the City legitimate and non-discriminatory reasons for his discharge. The evidence supports the court's findings.

[¶ 22] We affirm the judgment dismissing Thompson's employment discrimination claim.

[¶ 23] VANDE WALLE, C.J., and MARING, NEUMANN and SANDSTROM, JJ., concur.